

| | | |
|---|---|---|
| SIDLEY AUSTIN LLP | BEIJING | LOS ANGELES |
| ONE SOUTH DEARBORN STREET | BRUSSELS | NEW YORK |
| CHICAGO, IL 60603 | CHICAGO | PALO ALTO |
| (312) 853 7000 | DALLAS | SAN FRANCISCO |
| (312) 853 7036 FAX | FRANKFURT | SHANGHAI |
| | GENEVA | SINGAPORE |
| | HONG KONG | SYDNEY |
| | HOUSTON | TOKYO |
| | LONDON | WASHINGTON, D.C. |
| tscarborough@sidley.com | | |
| (312) 853 2236 | FOUNDED 1866 | |

April 19, 2013

**By CM/ECF**

Hon. Molly C. Dwyer
Clerk of Court
U.S. Court of Appeals for the Ninth Circuit
James R. Browning Courthouse
95 Seventh Street
San Francisco, CA 94103-1526

> Re:    *Urbino v. Orkin Services of California, Inc. and Rollins, Inc.*,
>          Nos. 11-56944, 11-57002
> _____

Dear Ms. Dwyer:

Orkin Services of California, Inc. and Rollins, Inc. (collectively, "Orkin") submit this letter to the panel for the above-captioned appeals under Federal Rule of Appellate Procedure 28(j). On April 11, 2013, the *en banc* Court issued the enclosed opinion in *Kilgore v. KeyBank, Nat'l Ass'n*, Nos. 09-16703, 10-15934. Although it relied on different reasoning, the *en banc* Court in *Kilgore* reached the same result that the *Kilgore* panel had reached: It held that the arbitration agreement at issue was not unconscionable, and that the district court had properly compelled arbitration. The positions advanced in Orkin's briefs in this case are fully consistent with the *en banc* decision in *Kilgore*, and the district court's decision denying Orkin's motion to compel arbitration should therefore be reversed for the reasons set forth in those briefs.

Pursuant to Rule 28(j), a copy of this letter, with enclosure, will be served upon counsel for Urbino through the Court's CM/ECF system.

Very truly yours,

s/ Theodore R. Scarborough

Theodore R. Scarborough

cc:    Peter M. Hart
        Amber S. Healy
        Katherine Marie Copeland
        Kenneth H. Yoon
        Stephanie E. Yasuda

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MATTHEW C. KILGORE, individually and on behalf of all others similarly situated; WILLIAM BRUCE FULLER, individually and on behalf of all others similarly situated;<br>*Plaintiffs-Appellees*,<br><br>v.<br><br>KEYBANK, NATIONAL ASSOCIATION, successor in interest to Keybank USA, N.A.; KEY EDUCATION RESOURCES, a division of Keybank National Association; GREAT LAKES EDUCATION LOAN SERVICES, INC., a Wisconsin corporation,<br>*Defendants-Appellants*, | No. 09-16703<br><br>D.C. No.<br>3:08-cv-02958-TEH |

2          KILGORE V. KEYBANK, NAT'L ASS'N

| | |
|---|---|
| MATTHEW C. KILGORE, individually and on behalf of all others similarly situated; WILLIAM BRUCE FULLER, individually and on behalf of all others similarly situated, *Plaintiffs-Appellants*, v. KEYBANK, NATIONAL ASSOCIATION, successor in interest to Keybank USA, N.A.; KEY EDUCATION RESOURCES, a division of Keybank National Association; GREAT LAKES EDUCATION LOAN SERVICES, INC., a Wisconsin corporation, *Defendants-Appellees*. | No. 10-15934 D.C. No. 3:08-cv-02958-TEH OPINION |

Appeal from the United States District Court
for the Northern District of California
Thelton E. Henderson, Senior District Judge, Presiding

Argued and Submitted En Banc
December 11, 2012—Pasadena, California

Filed April 11, 2013

KILGORE V. KEYBANK, NAT'L ASS'N          3

Before: Alex Kozinski, Chief Judge, Harry Pregerson, M.
Margaret McKeown, William A. Fletcher, Richard C.
Tallman, Consuelo M. Callahan, Milan D. Smith, Jr., Mary
H. Murguia, Morgan Christen, Paul J. Watford, and
Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz;
Dissent by Judge Pregerson

## SUMMARY[*]

### Arbitration

The en banc court reversed the district court's dismissal
of plaintiffs' claims, reversed the denial of defendants'
motion to compel arbitration, and remanded with instructions
to the district court to compel arbitration.

In an appeal involving a putative class action by former
students of a failed flight-training school who seek broad
injunctive relief against the bank that originated their student
loans and the loan servicer, the en banc court held that the
district court should have compelled arbitration under
California law. The en banc court held that the arbitration
clause was neither substantively nor procedurally
unconscionable under California law. The en banc court held
also that this case does not fall under the narrow "public
injunction" exception to the Federal Arbitration Act that was

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

4          KILGORE V. KEYBANK, NAT'L ASS'N

recognized in *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1082-84 (9th Cir. 2007).

Judge Pregerson dissented. Judge Pregerson would hold that the arbitration clause was unconscionable, and thus unenforceable.

---

**COUNSEL**

Andrew A. August and Kevin F. Rooney, Pinnacle Law Group, LLP; James C. Sturdevant (argued) and Whitney Huston, The Sturdevant Law Firm, San Francisco, California, for Plaintiffs-Appellees/Appellants.

W. Scott O'Connell (argued), Courtney Q. Brooks, and Kristen M. Yasenka, Nixon Peabody LLP, Manchester, New Hampshire; Matthew A. Richard, Todd C. Toral, and Stephanie Karnavas, Nixon Peabody LLP, San Francisco, California, for Defendants-Appellants/Appellees.

David Horton, Davis, California; Hiro N. Aragaki, Los Angeles, California, for Amici Curiae Law Professors.

Hiro N. Aragaki and David Doeling, Los Angeles, California, for Amici Curiae Arbitration Professors.

Donald M. Falk, Mayer Brown LLP, Palo Alto, California; Andrew J. Pincus (argued), Evan M. Tager, Archis A. Parasharami, and Scott M. Noveck, Mayer Brown LLP; Robin S. Conrad and Kate Comerford Todd, National Chamber Litigation Center, Inc., Washington, D.C., for Amicus Curiae The Chamber of Commerce of the United States of America.

Steve Bullock and Kelley L. Hubbard, Office of the Montana Attorney General, Helena, Montana, for Amicus Curiae State of Montana.

Arthur D. Levy; Nancy Barron, Kemnitzer, Barron & Krieg LLP, San Francisco, California, for Amicus Curiae The National Association of Consumer Advocates and The National Consumer Law Center.

Ellen Lake, Oakland, California; Terisa E. Chaw, The Employee Rights Advocacy Institute for Law & Policy; Rebecca M. Hamburg, National Employment Lawyers Association; Cliff Palefsky, McGuinn, Hillsman & Palefsky, San Francisco, California, for Amici Curiae National Employment Lawyers Association, The Employee Rights Advocacy Institute for Law & Policy, and California Employment Lawyers Association.

Mark A. Chavez, Chavez & Gertler LLP, Mill Valley, California, for Amicus Curiae The National Consumer Law Center, National Association of Consumer Advocates, Public Citizen and National Consumers League.

C. Dawn Causey and Gregory F. Taylor, American Bankers Association, Washington, D.C., for Amici Curiae American Bankers Association, Consumer Bankers Association, and the Clearing House Association, L.L.C.

## OPINION

HURWITZ, Circuit Judge:

This appeal involves a putative class action by former students of a failed flight-training school who seek broad injunctive relief against the bank that originated their student loans and the loan servicer. The central issue is whether the district court should have compelled arbitration. We hold that this case does not fall under the narrow "public injunction" exception to the Federal Arbitration Act we recognized in *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1082–84 (9th Cir. 2007), and remand with instructions to compel arbitration.

### I.

### A.

Silver State Helicopters, LLC ("SSH") operated a flight-training school in Oakland, California. SSH referred to KeyBank, N.A. ("KeyBank") as a "preferred lender" in marketing materials and encouraged prospective students to borrow from KeyBank. KeyBank financed virtually all SSH student tuition; Great Lakes Educational Loan Services ("Great Lakes") serviced the loans.

Every SSH student borrowing from KeyBank executed a promissory note ("Note"). The Note contained an arbitration clause, located in a section entitled "ARBITRATION," which provided, in relevant part:

> IF ARBITRATION IS CHOSEN BY ANY
> PARTY WITH RESPECT TO A CLAIM,

> NEITHER YOU NOR I WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM . . . . FURTHER, I WILL NOT HAVE THE RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. . . . I UNDERSTAND THAT OTHER RIGHTS I WOULD HAVE IF I WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION. . . .
>
> There shall be no authority for any Claims to be arbitrated on a class action basis. Furthermore, an arbitration can only decide your or my Claim(s) and may not consolidate or join the claims of other persons that may have similar claims.

The Note further provided that "[t]his Arbitration Provision will apply to my Note . . . unless I notify you in writing that I reject the arbitration provisions within 60 days of signing my Note."[1]

---

[1] The Note contained a choice-of-law clause providing that disputes would be governed by Ohio law and a forum-selection provision requiring disputes to be contested in Cuyahoga County, Ohio, KeyBank's principal place of business.

### B.

Matthew Kilgore and William Fuller ("Plaintiffs") were SSH students, who each borrowed over $50,000 from KeyBank. The Oakland school failed before they could graduate. After the school's demise, Plaintiffs brought this putative class action suit against KeyBank and Great Lakes (collectively, "Defendants") in California Superior Court, seeking to enjoin Defendants from reporting loan defaults to credit agencies and from enforcing Notes against former students.[2] The gravamen of the complaint was that Defendants had violated the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200–17210, because the Note and SSH's contracts with students failed to include language specified in the Federal Trade Commission's "Holder Rule."[3]

---

[2] Plaintiffs amended the complaint in state court to add a third representative plaintiff, Kevin Wilhelmy, and two defendants, Student Loan Xpress and American Education Services. These parties eventually settled and are no longer involved in this litigation.

[3] The Federal Trade Commission promulgated the Holder Rule in 1975 in response to concerns that sellers of goods and services were increasingly separating "the consumer's duty to pay from the seller's duty to perform" either by selling loan instruments to a third party after execution or by acting as a conduit between purchasers and third-party lenders. Promulgation of Trade Regulation Rule and Statement of Basis and Purpose, 40 Fed. Reg. 53,506, 53,507 (Nov. 18, 1975) (emphasis omitted) (codified at 16 C.F.R. pt. 433). The Rule requires consumer credit contracts to include the following language: "ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF." 16 C.F.R. § 433.2(a).

Defendants timely removed the case to the District Court for the Northern District of California,[4] and filed a motion to compel arbitration. After the district court denied the motion, *Kilgore v. Keybank, Nat'l Ass'n*, No. C 08-2958 TEH, 2009 WL 1975271, at \*1 (N.D. Cal. July 8, 2009),[5] Defendants appealed. We have jurisdiction over Defendants' appeal under 9 U.S.C. § 16(a)(1)(C).

After Defendants filed their notice of appeal, the district court allowed Plaintiffs to file a third amended complaint. The court then granted Defendants' motion to dismiss for failure to state a claim upon which relief can be granted. *Kilgore v. KeyBank*, 712 F. Supp. 2d 939, 947–58 (N.D. Cal.

---

Plaintiffs do not assert that the Holder Rule gives rise to a private cause of action, but instead seek to vindicate this right through their state law claim. *See Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 988–89 (D.C. Cir. 1973) (holding that private actions to vindicate rights asserted under the Federal Trade Commission Act may not be maintained).

[4] The notice of removal invoked federal jurisdiction based on a federal question, *see* 28 U.S.C. § 1331; complete diversity of citizenship, *see* 28 U.S.C. § 1332(a); and minimal diversity under the Class Action Fairness Act, *see* 28 U.S.C. § 1332(d)(2). After removal, Plaintiffs dropped their federal question claims.

[5] In denying the motion to compel arbitration, the district court applied California law, notwithstanding the Ohio choice-of-law provision in the Note. *Kilgore*, 2009 WL 1975271, at \*5–8 (citing *Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008) (per curiam) (applying California conflict-of-law analysis to choice-of-law provision in credit card contract)). We need not consider which law is applicable as the result would be the same in light of our decision that the district court should have compelled arbitration. *See* note 11, *infra*.

2010).**[6]** Plaintiffs appealed, and we have jurisdiction under
28 U.S.C. § 1291.**[7]**

## II.

Plaintiffs argue that the district court erred by dismissing
their third amended complaint, and Defendants argue that the
district court erred by refusing to compel arbitration. Under
the Federal Arbitration Act, if Defendants are correct, the
district court should never have reached the merits of
Plaintiffs' claims. *See* 9 U.S.C. § 3 (requiring stay of civil
action during arbitration). Therefore, we begin with whether
the district court erred in declining to compel arbitration, a
decision we review *de novo*. *Chalk v. T-Mobile USA, Inc.*,
560 F.3d 1087, 1092 (9th Cir. 2009).

## A.

The Federal Arbitration Act ("FAA") makes an
agreement to arbitrate "valid, irrevocable, and enforceable."
9 U.S.C. § 2. The FAA was intended to "overcome an
anachronistic judicial hostility to agreements to arbitrate,
which American courts had borrowed from English common
law," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,
Inc.*, 473 U.S. 614, 625 n.14 (1985), that resulted in "courts'
refusals to enforce agreements to arbitrate," *Allied-Bruce*

---

**[6]** The district court held that the various counts in the third amended
complaint either failed to state a claim upon which relief could be granted,
*Kilgore*, 712 F. Supp. 2d at 947–53, or were preempted by federal law, *id.*
at 953–58.

**[7]** We consolidated the two appeals. Order, *Kilgore v. KeyBank, Nat'l
Ass'n*, Nos. 09-16703, 10-15934 (9th Cir. June 3, 2010).

*Terminix Cos. v. Dobson*, 513 U.S. 265, 270 (1995). Recent opinions of the Supreme Court have given broad effect to arbitration agreements. *See, e.g.*, *Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1203–04 (2012) (per curiam) (upholding arbitration provision despite state law prohibiting pre-dispute agreements to arbitrate personal injury and wrongful death claims); *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1753 (2011) (holding that the FAA preempted a California rule that made class action waivers unconscionable); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001) (confining FAA exemption for workers engaged in interstate commerce to transportation workers).

The FAA "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). The basic role for courts under the FAA is to determine "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

**B**.

Section 2 of the FAA contains a savings clause, which provides that arbitration agreements are "enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This savings clause "preserves generally applicable contract defenses." *Concepcion*, 131 S. Ct. at 1748. Plaintiffs advance two theories as to why the FAA savings clause defeats the arbitration clause in the Note. We find neither availing.

### 1.

Under the FAA savings clause, state law that "arose to govern issues concerning the validity, revocability, and enforceability of contracts generally" remains applicable to arbitration agreements. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 685–87 (1996) (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)). "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Casarotto*, 517 U.S. at 687.

Under California law, a contractual provision is unenforceable if it is both procedurally and substantively unconscionable. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000). "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.*

"Substantive unconscionability focuses on the one-sidedness or overly harsh effect of the contract term or clause." *Harper v. Ultimo*, 7 Cal. Rptr. 3d 418, 423 (Cal. Ct. App. 2003). Plaintiffs claimed below that the Note's ban on class arbitration is unconscionable under California law, but that argument is now expressly foreclosed by *Concepcion*, 131 S. Ct. at 1753.[8] Plaintiffs' assertion that students may not

---

[8] In holding that California law rendered the class arbitration waiver unconscionable, the district court relied on *Discover Bank v. Superior Court*, 113 P.3d 1100 (Cal. 2005), *abrogated by Concepcion*, 131 S. Ct. at 1753. In addressing the issue, the district court did not have the benefit of the Supreme Court's later *Concepcion* opinion.

be able to afford arbitration fees fares no better.  *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90–91 (2000) ("The 'risk' that [a plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.").  And nothing else in the arbitration clause in the Note suggests substantive unconscionability.[9] *Cf. Armendariz*, 6 P.3d at 690–94 (holding unilateral arbitration provision substantively unconscionable); *Harper*, 7 Cal. Rptr. 3d at 423 (explaining substantive unconscionability of arbitration damages limit).

Nor is the arbitration provision procedurally unconscionable.  "Procedural unconscionability focuses on the factors of surprise and oppression. . . ."  *Harper*, 7 Cal. Rptr. 3d at 422.  The arbitration clause allows students to reject arbitration within sixty days of signing the Note.  This provision is more forgiving than the one in *Circuit City Stores, Inc. v. Ahmed*, where we found thirty days a sufficient period in which to consider whether to opt out of arbitration. 283 F.3d 1198, 1199–1200 (9th Cir. 2002).  Nor was the arbitration clause buried in fine print in the Note, but was instead in its own section, clearly labeled, in boldface.  *Cf. A & M Produce Co. v. FMC Corp.*, 186 Cal. Rptr. 114, 124–25 (Cal. Ct. App. 1982) (finding procedural unconscionability of

---

[9] The Note also includes a clause preventing disclosure of any arbitration award.  Although we have found confidentiality provisions to be substantively unconscionable when applied to a large class of customers, *Ting v. AT&T*, 319 F.3d 1126, 1151–52 (9th Cir. 2003), the small number of putative class members in this case (approximately 120) mitigates such concerns.  In any event, the enforceability of the confidentiality clause is a matter distinct from the enforceability of the arbitration clause in general.  Plaintiffs are free to argue during arbitration that the confidentiality clause is not enforceable.

consequential damage provision contained in middle of last page of an agreement in inconspicuous font).

### 2.

#### a.

The UCL authorizes broad injunctive relief to protect the public from unfair business practices. Cal. Bus. & Prof. Code § 17203. The Supreme Court has suggested that claims arising from a statute whose underlying purpose creates an "inherent conflict" with the federal policy favoring arbitration may be exempt from the FAA.[10] *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991). Relying on *Gilmer*, the California Supreme Court has found an inherent conflict between the FAA policy favoring arbitration and California statutes authorizing "public" injunctive relief. *Broughton v. Cigna Healthplans of Cal.*, 988 P.2d 67, 73, 78 (Cal. 1999).

The *Broughton* plaintiffs "were covered by Medi–Cal, which had negotiated a contract with Cigna . . . for health care coverage." *Id.* at 71. They sued Cigna under California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750–85, seeking damages for medical malpractice and injunctive relief against Cigna's allegedly deceptive advertising. *Broughton*, 988 P.2d at 71. The California Supreme Court held the damages claim subject to the arbitration clause in the Cigna policy because "[s]uch an action is primarily for the benefit of a party to the arbitration, even if the action incidentally vindicates important public

---

[10] The parties dispute whether the "inherent conflict" exemption is limited to federal statutes or applies to both federal and state statutes. For the reasons discussed below, we need not resolve this issue.

interests." *Id.* at 79. But the Court also found that because the plaintiffs were "functioning as a private attorney general, enjoining future deceptive practices on behalf of the general public," *id.* at 76, their injunction claims were not arbitrable, *id.* at 75–78.

The California Supreme Court expanded upon *Broughton* in *Cruz v. PacifiCare Health Systems, Inc.*, 66 P.3d 1157 (Cal. 2003). Plaintiff there alleged that PacifiCare had fraudulently induced its customers to enroll in health care programs while at the same time discouraging primary care physicians from providing services to enrollees. *Id.* at 1159. The complaint sought injunctive and monetary relief under the UCL, Cal. Bus. & Prof. Code § 17200, which prohibits unfair business practices, and under section 17500 of the same, which prohibits untrue or misleading statements designed to mislead the public. *Cruz*, 66 P.3d at 1164–65. PacifiCare invoked the arbitration clause in its contract with enrollees. *Id.* at 1160.

As in *Broughton*, the California Supreme Court in *Cruz* held that the plaintiff's claims for monetary relief were subject to arbitration, because any public benefit from such relief would be "incidental to the private benefits obtained from those bringing the restitutionary or damages action." *Id.* at 1166. Extending the reasoning of *Broughton* to claims brought under the UCL and Business and Professions Code, the *Cruz* court found "the request for injunctive relief is clearly for the benefit of health care consumers and the general public" and therefore not subject to arbitration. *Id.* at 1164.

We applied the *Broughton-Cruz* framework in *Davis*, 485 F.3d at 1081–84. There, an employer "adopted and

distributed to its employees a new Dispute Resolution Program (DRP) that culminated in final and binding arbitration of most employment-related claims by and against its employees." *Id.* at 1070. The DRP prohibited the filing of both judicial and administrative actions. *Id.* at 1081–82. Citing the *Gilmer* dictum, we noted that "employment rights under the [Fair Labor Standards Act] and California's Labor Code" were analogous to substantive "statutory rights established for a public reason." *Id.* at 1082 (internal quotations and citations omitted). Because the *Davis* plaintiffs sought to vindicate these statutory rights through public injunctions, we found the DRP unenforceable to the extent that it barred claims for public injunctive relief. *Id.*

**b.**

Defendants argue that *Davis* was vitiated by *Concepcion*, and the *Broughton-Cruz* rule no longer exempts a public injunction claim from arbitration. We need not reach that broad argument. Even assuming the continued viability of the *Broughton-Cruz* rule, Plaintiffs' claims do not fall within its purview.

Public injunctive relief "is for the benefit of the general public rather than the party bringing the action." *Broughton*, 988 P.2d at 78. A claim for public injunctive relief therefore does not seek "to resolve a private dispute but to remedy a public wrong." *Id.* at 76. Whatever the subjective motivation behind a party's purported public injunction suit, the *Broughton* rule applies only when "the benefits of granting injunctive relief by and large do not accrue to that party, but to the general public in danger of being victimized by the same deceptive practices as the plaintiff suffered." *Id.*

The claim for injunctive relief here does not fall within the "narrow exception to the rule that the FAA requires state courts to honor arbitration agreements." *Cruz*, 66 P.3d at 1162. The third amended complaint seeks an injunction prohibiting Defendants from reporting non-payment of a Note by putative class members to credit agencies, from enforcing a Note against any class member, and from disbursing the proceeds of any loans to a seller whose consumer credit contract did not include Holder Rule language. The requested prohibitions against reporting defaults on the Note and seeking enforcement of the Note plainly would benefit only the approximately 120 putative class members. The requested injunction against disbursing loans to sellers who do not include Holder Rule language in their contracts, while ostensibly implicating third parties, also falls outside the *Broughton-Cruz* rule. The third amended complaint expressly notes that KeyBank had completely withdrawn from the private school loan business and does not allege that the bank is engaging in other comparable transactions. The injunctive relief sought thus, for all practical purposes, relates only to past harms suffered by the members of the limited putative class.

The central premise of *Broughton-Cruz* is that "the judicial forum has significant institutional advantages over arbitration in administering a public injunctive remedy, which as a consequence will likely lead to the diminution or frustration of the public benefit if the remedy is entrusted to arbitrators." *Broughton*, 988 P.2d at 78. That concern is absent here, where Defendants' alleged statutory violations have, by Plaintiffs' own admission, already ceased, where the class affected by the alleged practices is small, and where

18          KILGORE v. KEYBANK, NAT'L ASS'N

there is no real prospective benefit to the public at large from
the relief sought.**[11]**

### III.

For the reasons above, we **VACATE** the district court's
dismissal of Plaintiffs' claims, **REVERSE** the denial of
Defendants' motion to compel arbitration, and **REMAND**
with instructions to the district court to compel arbitration.

PREGERSON, Circuit Judge, dissenting:

### I. Hustled by the school; hustled by the bank.

Silver State Helicopter School did not do a good job
training helicopter pilots, placing them in jobs, or managing
its own finances. But it did make a convincing sales pitch.
Silver State promised its students that they would get the
training required to get good paying jobs as commercial
helicopter pilots.

At flashy career fairs around California, Silver State
worked hard to sign up prospective students for its helicopter
pilot training program. Former Silver State student, Mathew
Kilgore, declared under penalty of perjury:

---

[11] Because we hold that arbitration is required under California law, we
need not address Defendants' contention that Ohio law (which apparently
has no *Broughton-Cruz* rule, *see Eagle v. Fred Martin Motor Co.*,
809 N.E.2d 1161, 1170 (Ohio Ct. App. 2004)) should apply.

KILGORE V. KEYBANK, NAT'L ASS'N          19

> The seminar was very impressive and glitzy.
> There were numerous helicopters onsite and
> the school appeared to be very professional.
> [Silver State's CEO, Jerry Airola] was very
> convincing and portrayed Silver State as a top
> flight school.  The presentation made clear
> that Silver State was very selective about
> which students would be chosen to attend the
> school . . . Mr. Airola emphasized that all of
> the tuition to fund the entire Silver State
> education could be obtained through Silver
> State's partner lender, KeyBank.  Mr. Airola
> also emphasized that . . . the loans would only
> cost the students about [a] hundred dollars a
> week at 4% interest.

Airola's claims were not true.  Silver State accepted almost
all applicants who could get their loans approved.  Silver
State lacked sufficient equipment or instructors to properly
train its students.  The variable rate interest on the loans
would rise far above four percent.[1]    Matthew Kilgore,
William Fuller, and the other 120 putative class members
believed what Airola told them and signed up. They took out
$55,950 loans, which KeyBank promptly forked over to
Silver State before students took a single class.

But Silver State knew it was headed for a crash landing.
By 2008, Silver State had racked up ten million dollars in
debt against fifty thousand dollars in assets.  Moreover,
despite Silver State's alluring promises, there was no
significant demand for helicopter pilots with a Silver State

---

[1] *See* Appendix at 9.

degree. And it wasn't just the school that knew it. Defendant KeyBank knew it, too.

KeyBank, an Ohio-based lending giant, participated in the fraud that Silver State perpetrated on unwitting students. From 2003 to 2005 KeyBank financed ninety-five percent of the tuition students paid to Silver State. KeyBank printed up lengthy loan papers that lacked the Federal Trade Commission's Holder Rule Notice. 16 C.F.R. § 433.2 The Holder Rule required the loan contracts to notify students that KeyBank was subject to the same claims and defenses as Silver State. *Id.* The Holder Rule protects borrowers, such as the students, from being legally obligated to pay a creditor like KeyBank "despite breach of warranty, misrepresentation, or even fraud on the part of the seller." 40 Fed. Reg. 53,506, 53,507 (Nov. 18, 1975). By omitting that notice from its printed loan contracts, KeyBank may have sought to insulate itself from liability for Silver State's misleading promises. Silver State then presented those faulty loan contracts to prospective students and "pressure[d] the students to sign the [master promissory notes] as soon as possible," according to an affidavit of Silver State's former student finance manager Jody Pidruzny. And sign up they did.

Once a student signed the promissory note, KeyBank immediately transferred the full amount of the loans to Silver State. KeyBank then turned a profit by selling the students' loans on the securities market to investors. Defendant Great Lakes Educational Loan Services, Inc. continues to service those loans by collecting payments from students, and notifying credit reporting agencies when students fail to pay.

KeyBank loaned students tuition money to attend Silver State knowing that Silver State was financially volatile. A

2004 email between KeyBank Vice Presidents Paul
McDermott and Rodney Landrum predicted that Silver State
"could be the next 'big one' to go under." Nevertheless,
KeyBank made more than ten million dollars in loans to
Silver State students over the following two years. In 2008,
Silver State filed for bankruptcy and closed its doors.
Students could not recoup the amount of their unused tuition
because Silver State sought protection under Chapter 7
bankruptcy proceedings.

Kilgore, Fuller, and their classmates were left holding the
bag with no degree, no helicopter piloting career, and no
opportunity to train. The students' failed attempts to launch
flight careers saddled them with huge private loans that are
collecting interest and weighing them down.

The private loans students incurred to pay for Silver State
helicopter pilot training were not subsidized or insured by the
federal government. Private student loans are generally more
expensive than federal loans, especially for students with
lower credit scores or limited credit histories. Students could
borrow larger amounts because there are no loan limits for
private loans. Morever, students who hold private loans are
not eligible for federal programs that allow them to reduce
their monthly payments based on their income, or have their
loans forgiven after working for ten years in public service
jobs.[2]

---

[2] *See* Editorial, *Student Debt and the Economy*, N.Y. Times, March 10,
2013, at SR 10 ("Because private loans offer little flexibility, borrowers
in bad straits have few options except default, which makes it difficult for
them to get jobs or credit, or even to rent apartments.").

Unlike federally guaranteed loans, private student loans are not discharged should the school go out of business. The students themselves cannot discharge these loans in bankruptcy proceedings unless they can prove that "excepting such [student] debt from discharge . . . would impose an undue hardship."  11 U.S.C. § 523(a)(8).

## II. Ignored by the courts.

To make matters worse, the majority opinion strips Kilgore, Fuller, and their classmates of the ability to find recourse in state or federal court. The majority holds that we must compel arbitration in the students' case, a holding at odds with the district court's decision. According to the majority, the arbitration clause was not unconscionable. I disagree.

A contract provision is unenforceable under California law if it is both procedurally and substantively unconscionable. *See Pokorny v. Quixtar, Inc*., 601 F.3d 987, 996 (9th Cir. 2010). California applies a sliding scale to determine if a contract is unenforceable due to unconscionability. *Armendariz v. Found. Health Psychcare Servs.*, 6 P.3d 669, 690 (Cal. 2000). The more substantively unconscionable the contract, the less procedurally unconscionable it must be to be found unconscionable, and vice versa. *Id.* Here, the arbitration clause is highly procedurally *and* substantively unconscionable.

### A. Procedurally Unconscionable

If both parties agree to give up the protections of the courts, arbitration can be a just and efficient way to resolve disputes. But Kilgore, Fuller, and their classmates signed

contracts under unconscionable "take it or leave it" conditions. *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 996 (9th Cir. 2010). This means that they did not agree to arbitration. Without such an agreement, it is wholly inappropriate to stop them from having their claims decided by a court.

Under California law:   "A contract is procedurally unconscionable if it is a contract of adhesion, *i.e.*, a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003). Procedural unconscionability focuses on the "the factors of surprise and oppression in the contracting process." *Pokorny*, 601 F.3d at 996.

There can be no doubt that the promissory notes were contracts of adhesion, and that surprise and oppression dominated the contracting process.  I have attached as an Appendix the dense, small print, and blurry nine-page contract that Silver State thrust on the students at career fairs and open houses.  The arbitration clause at issue was buried in the middle of the contract, split over two pages, and surrounded by language that was difficult to read and understand. *See* Appendix at 3–4; *see also Ingle v. Circuit City Stores, Inc.*, 328 F. 3d 1165, 1171 (2003) ("Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." (internal quotations and citations omitted)).   KeyBank officials never discussed the loans with students or mentioned the arbitration clause to them.  KeyBank left those jobs to Silver State's financial aid staff–employees who, according to the record, did not know that the loans contained

arbitration clauses. Silver State staff pressured students to
sign the loans immediately or else risk losing their spots in
the school. Pidruzny, the school's Student Finance Manager,
explained the strategy in her sworn declaration:

> At the direction of my superiors I conveyed
> KeyBank's and Silver State's directives to
> expedite the loan application process and
> pressure the students to sign the [Master
> Promissory Notes] as soon as possible . . . I
> did not discuss the terms of the [Master
> Promissory Notes] with Silver State students.
> Specifically, I did not discuss the Arbitration
> Provision with any Silver State Student . . . .

In light of these facts, it is unsurprising that students felt
pressured to sign the contract without knowing it contained
an arbitration clause. Moreover, the sixty day opt-out
provision was meaningless because students did not know the
arbitration clause existed in the first place. As Kilgore
declared, "I did not know that the Promissory Note contained
an arbitration provision (nor did I know that I could opt out
of the arbitration provision) . . . I believed that the Promissory
Note had to be signed immediately and I felt pressured to do
so. I believed that if I did not sign the Promissory Note I
would lose my spot at Silver State." Surprise? Yes.
Oppression? Yes. Procedural unconscionability? Definitely.

**B. Substantively Unconscionable**

A contract provision is substantively unconscionable if it
is "one-sided and will have an overly harsh effect on the
disadvantaged party. Thus, mutuality is the paramount
consideration when assessing substantive unconscionability."

*Pokorny*, 601 F.3d at 997 (internal quotations and citations omitted). To make that determination, courts must "look beyond facial neutrality and examine the actual effects of the challenged provision." *Ting*, 319 F.3d at 1149. KeyBank's contract fails the mutuality test in three respects:

**1.** The confidentiality provision requires both parties to maintain the confidentiality of any claim they arbitrate. While facially neutral, this claim overwhelmingly favors KeyBank. A student who wins in arbitration against KeyBank cannot alert other students or arbitrators to KeyBank's predatory practices that led to the win. But KeyBank is a repeat player in these arbitrations; it knows the outcome of each arbitration and can use that knowledge to its advantage. *Id.* at 1152 (Defendant "has placed itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, defendant accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract.").

**2.** The high cost of arbitration imposes another unequal burden, creating further substantive unconscionability. Filing a civil case in California Superior Court costs less than five hundred dollars. Filing the same claim before an arbitrator, runs more than four thousand dollars. The high cost of arbitration will prevent many students from vindicating their rights, but will not limit KeyBank's ability to defend itself. This asymmetry makes arbitration all the more unconscionable. *See Ting*, 319 F.3d at 1151 (finding a fee-splitting arbitration clause unconscionable "because it imposes on some consumers costs greater than those a complainant would bear if he or she would file the same complaint in court.").

**3.** The arbitration process itself greatly favors banks over consumers. One study found that the National Arbitration Forum, one of the two arbitrators named in the contract, ruled for banks and credit card companies, and against consumers ninety-four percent of the time.[3] This further gives KeyBank an unfair advantage in resolving any claims.

KeyBank foisted loans on students who staked their financial well-being on the shaky promises of Silver State Helicopter school. When Silver State went down, so did the students. The students deserve, and I submit the law requires, that their claims be heard and adjudicated by a court. The provision in the promissory note relegating students to arbitration is unconscionable and thus unenforceable. Therefore, I dissent.

---

[3] Public Citizen, *The Arbitration Trap: How Credit Card Companies Ensare Consumers* 2 (2007), available at http://www.citizen.org/documents/ArbitrationTrap.pdf.

## APPENDIX

### REDACTED*

#### Key Alternative Loan Program

Date: October 21, 2004

Borrower Name: Matt C. Kilgore

Cosigner Name:

Borrower Social Security Number:

Cosigner Social Security Number:

**MASTER STUDENT LOAN PROMISSORY NOTE**
No white-outs or scratch-outs of terms will be accepted on this Promissory Note.

**A. IDENTIFICATION OF PARTIES AND TERMS**

In this Application/Master Student Loan Promissory Note, unless otherwise provided, the words "I," "we," "our," "us," "me," "my," and "mine" mean the person(s) who signed this Application/Master Student Loan Promissory Note as borrower, co-borrower, and/or cosigner. "You," "your," "yours," and "lender" mean KeyBank National Association, Cleveland, Ohio, or its successors and assigns, and any other holder of this Master Student Loan Promissory Note. Terms in initial capital letters in this Note have the definitions set forth in Paragraph D or elsewhere in this Note, unless otherwise noted.

**B. PROMISE TO PAY; CONSOLIDATION; AGGREGATING BALANCES**

This is a consumer credit transaction. I promise to pay to your order or in any subsequent holder all principal sums disbursed under the terms of this Note and, in addition, interest on such principal sums, interest on any Capitalized Interest, and other charges and fees that may become due as provided in this Note. I will pay all of these amounts to you at the address shown in my coupon book. I understand and agree that you may make multiple Loans to me under the KeyBank National Association Loan Program listed in Paragraph D.10 ("the Loan Program") subject to the terms of this Note. I understand and agree that this Note sets forth the terms and conditions applicable to all Loans made to me under the Loan Program on or after the date of this Note and before the date of any subsequent master student loan promissory note relating to Loans obtained under the Loan Program that I have signed. I understand and agree that, for the first Loan that I obtain subject to the terms of this Master Student Loan Promissory Note, in addition to this Master Student Loan Promissory Note, I will receive a Disclosure Statement. I further understand and agree that I will not receive a new master student loan promissory note for any additional Loan(s) that I may obtain under the Loan Program unless I am required to sign a new master student loan promissory note because of the nature of the modifications of the terms of this Master Student Loan Promissory Note or any subsequent master student loan promissory note relating to loans obtained under the Loan Program that I have signed. I will receive a new Disclosure Statement with respect to each such new Loan. In addition, I understand and agree that, at your option, you may consolidate any or all of the following onto one Loan subject to the terms of this Note: (i) any loan(s) that I have in effect under the Loan Program before the date of this Note and (ii) any Loan(s) that I may obtain under the Loan Program on or after the date of this Note and before the date of any subsequent master student loan promissory note relating to loans obtained under the Loan Program that I have signed.

I also understand and agree that, at your option, whether or not my Loan(s) subject to the terms of this Note or any loans that I have in effect under the Loan Program before the date of this Note have been consolidated, you may aggregate the total outstanding balance of each such Loan and loan prior to repayment solely for purposes of determining my monthly payment amount and repayment term. In this event, you will determine my monthly payment amount and repayment term based on the terms of my most recent Loan made under the Loan Program.

**C. GENERAL PROVISIONS; AUTHORITY NOT TO MAKE LOANS OR DISBURSEMENTS; WRITINGS; SIGNATURES**

1. When you receive my signed Note, you are not agreeing to lend me money and there will be no such agreement until the time you make the first disbursement on the Loan. Based on your evaluation of my credit qualifications, which you may conduct as part of your review of my Application or at any time during the term of any Loan(s) that I obtain subject to the terms of this Note, you have the right not to make a Loan or a disbursement on a Loan or to lend an amount less than the Amount Requested. I agree to accept an amount less than the Amount Requested and to repay that portion of the Amount Requested that you actually lend to me, plus interest on such principal sums, interest on any Capitalized Interest, and other charges and fees that may become due as provided in this Note.

2. All Applications, Disclosure Statements, and separate Cosigner Notices (if any) relating to any Loan subject to the terms of this Note are incorporated in and made a part of this Note.

3. If, under this Note, an act or agreement must be "written" or in "writing," an act or agreement performed or provided by means of electronic communication will be considered to be "written" or in "writing," as the case may be. If, under this Note, a document must be "signed," a digital or electronic signature that complies with applicable federal law requirements or (in the case of the lender) a pre-affixed facsimile signature will meet this requirement.

4. After you decide to make a Loan to me, you will send me a Disclosure Statement. In addition to other information, the Disclosure Statement will tell me the amounts of my disbursements and the amount of any loan fee.

5. I will review my Disclosure Statement upon receiving it and will contact you if I have any questions.

6. Unless I choose to have my monthly payments automatically debited, I will

receive a coupon book on any Loan(s) subject to the terms of this Note. For purposes of this Paragraph C.6, "I" refers only to the borrower.

**D. DEFINITIONS**

1. Amount Requested - means the dollar amount of the Loan requested at the time of my Application.

2. Application - means the written or oral request that I make to you for a Loan under the Loan Program.

3. Capitalized Interest - means accrued and unpaid interest that has been added to the principal balance of a Loan.

4. Cosigner Notice - means any notice that describes the obligations of a cosigner under this Note and that is signed by my cosigner with respect to any Loan that I obtain subject to the terms of this Note under the Loan Program.

5. Disbursement Date - means any date on which you lend money to me in consideration for this Note and will be the date shown on my Loan check or the date the Loan funds are electronically transferred to my Institution.

6. Disclosure Statement - means a disclosure statement setting forth the information required by the federal Truth-in-Lending Act and Federal Reserve Board Regulation Z, 12 C.F.R. Part 226, or such other disclosure statement that you may provide when a disclosure statement is not required under this Act and Regulation Z.

7. Institution - means the educational institution, if any, to which the proceeds of my Loan(s) are payable.

8. Interim Period - means the period beginning on the initial Disbursement Date and ending on the date which is six (6) months after I graduate from, or otherwise cease to be enrolled at least half-time at the Institution identified at the time of my Application or any other eligible Institution.

9. Loan - means all principal sums disbursed during the twelve (12)-month term of an academic year of the Loan Program (as such year is designated by you) under the terms of this Note, plus interest on such principal sums, interest on any Capitalized Interest, and other charges and fees that may become due under the Loan as provided in this Note.

10. KeyBank National Association Loan Program ("Loan Program") - means the Key Alternative Loan® program.

11. Note - means this Master Student Loan Promissory Note acting forth the terms applicable to all Loans that I have in effect under the Loan Program before the date of this Note (that you have agreed to consolidate into this Note) and that I may obtain under the Loan Program on or after the date of this Note. The term "Note," as used in this Master Student Loan Promissory Note, includes the Applications, Disclosure Statements, and Cosigner Notices (if applicable) relating to all Loans that I obtain subject to the terms of this Note, unless otherwise provided.

12. Repayment Period - means the period beginning on the day after the Interim Period ends and continuing for one hundred and twenty (120) months if the total principal balance of my loans under the Loan Program and my Loans subject to the terms of this Note is less than $15,000, one hundred and eighty (180) months if the total principal balance of my loans under the Loan Program and my Loans subject to the terms of this Note is equal to or greater than $15,000 and less than $60,000, or two hundred and forty (240) months if the total principal balance of my loans under the Loan Program and my Loans subject to the terms of this Note is equal to or greater than $60,000. The length of the Repayment Period is subject to limitations on the period of repayment under applicable law.

**E. INTEREST**

1. Accrual - Interest on this Note will accrue at an interest rate equal to the Variable Rate. Interest begins to accrue on the initial Disbursement Date and will continue to accrue until the entire principal balance and all other amounts are paid in full. Interest will accrue on the unpaid principal balance in the extent it is disbursed to me or paid on my behalf, and on Capitalized Interest and any other fees added to the principal balance in accordance with the terms of this Note. Interest will be calculated on the basis of the actual number of days in the year and the actual number of days elapsed, including holidays and days on which you are not open for the conduct of banking business. If I do not pay interest to you during any Interim Period, at your option, you may add such interest to the principal balance of the Loan in accordance with Paragraph E.4.

2. Variable Rate - During any Interim Period, the annual variable interest rate (the "Variable Rate") is equal to the Current Index, plus an "Interim Margin" not to exceed 3.85%. During any Repayment Period, the Variable Rate is equal to the Current Index, plus a "Repayment Margin" not to exceed 3.85%. The Variable Rate may increase or decrease and will be adjusted quarterly on the first day of each January, April, July, and October (the "Change Date") if the Current Index changes. In no event will the Variable Rate be more than the maximum rate permitted under applicable law.

3. Current Index - The "Current Index" is the three-month London Interbank Offered Rate ("LIBOR") published in the "Money Rates" section of *The Wall Street Journal*

---

*On every page of the master student loan promissory note, I redacted the signer and co-signer's social security number, and the co-signer's name.

Appendix Page 1

REDACTED

Date: October 21, 2004

Borrower Name: Matt C. Kilgore

Borrower Social Security Number:

Cosigner Name:

Cosigner Social Security Number:

on the 20th day of the month preceding the applicable "Change Date" (e.g., December, March, June, and September), subject to the limitations herein. You will use the three-month LIBOR published on the 20th day of the preceding month without regard to the two-day delayed effective date. If the 20th day of the month is not a business day, the preceding business day will be used to determine the Current Index. For purposes of this Paragraph E.3, "business day" means any day the banks in New York and London are open for the transaction of business. You may round the "Current Index" higher to two decimal places. For example, 6.68751% will be rounded to 6.69%. (This is an example and may not be reflective of the actual LIBOR.) LIBOR is the British Banker's Association average of interbank offered rates for dollar deposits in the London market based on quotations at 16 major banks. LIBOR is merely a pricing index and is not necessarily the lowest interest rate index used by you or any other lender. If LIBOR is no longer available, you will choose a comparable index.

4. Capitalization - At your option, you may add all accrued and unpaid interest to the principal balance of my Loan, on the last day of any Interim Period, and on the last day of any period of forbearance. I agree to the addition of accrued and unpaid interest to the principal balance (the "compounding" of interest) as set forth in Paragraph E.1 and this Paragraph E.4.

**F. TERMS OF REPAYMENT**

1. Interim Period - I may, but am not required to, make payments of interest or principal during the Interim Period. You may add accrued unpaid interest that I do not pay during the Interim Period to the principal balance as set forth in Paragraphs E.1 and E.4.

2. Repayment Period - During the Repayment Period, I will make consecutive monthly payments in the indicated amounts by the payment due dates shown in my coupon book until I have paid all of the principal and interest and any other charges that I may owe under the Note.

3. Repayment Terms - I will repay my Loan in consecutive monthly installments of principal and interest. If my Variable Rate increases or decreases, so that the total amount I must pay to you increases or decreases, my monthly payment will stay the same but I will make more or fewer monthly payments than would otherwise be required. My monthly payment amount will not be changed unless my Variable Rate increases to the point where that amount will not repay my Loan in full within the maximum permissible Repayment Period. In that case, my monthly payment amount may be increased to the minimum payment that will do so. If this should happen, you will notify me of my new monthly payment amount. I understand that I may increase my monthly payment amount at any time.

4. Amounts Owing at the End of the Repayment Period - Since interest accrues daily upon the unpaid principal balance of my Loan, if I make payments after my payment due dates, I may owe additional interest and returned check/NSF fees. If I have not paid my late charges I will also owe additional amounts for those late charges and returned check /NSF fees. In such case, you will increase the amount of my last monthly payment amount to the amount necessary to repay my Loan in full.

5. Application of Payments - You may apply payments on any Loan in any manner that you determine within your sole discretion.

6. Minimum Payment - Notwithstanding any other provision of Paragraph F, if my required payment in any month is less than $50.00, at your request, I agree to pay $50.00 (principal and interest) or the unpaid balance, whichever is less.

**G. LATE CHARGES AND/OR RETURNED PAYMENT/NSF FEES**

On any Loan that I obtain subject to the terms of this Note:

1. Late Charges - I agree to pay a late charge if I fail to make any part of an installment payment within fifteen (15) days after it becomes due. I will pay only one late charge for an installment payment, regardless of the number of days it is late. The late charge may not exceed the lesser of $5.00 or 5.00% of the unpaid amount of the installment.

2. Returned Payment/NSF Fees - I agree to pay a returned payment/NSF fee of $20.00 on the next payment if my bank returns my payment or if any check or other instrument given for any payment is dishonored for any reason, in addition to the fees that my bank may assess.

**H. RIGHT TO PREPAY**

I have the right to prepay all or any part of my Loan(s) at any time without penalty. Prepayment of less than all of the outstanding balance of my Loan(s) will not reduce the amount of monthly payments or postpone the due date of monthly payments, but will reduce the number of payments I must make. In any event, I will not be entitled to a refund of any part of the interest or finance charge already paid.

**I. FORBEARANCE**

If I am unable to repay any of my Loans in accordance with the terms established under this Note, I may request that you modify these terms. I understand that such modification would be at your option. I understand that I will remain responsible for all interest accruing during any period of forbearance.

**J. DEFAULT; WHOLE LOAN DUE**

Subject to the limitations of applicable law, I will be in default under this Note and you have the right to (i) give me notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to you under the terms of this Note, are due and payable at once (subject to any applicable law that may give me a right

to cure my default) and (ii) cease to make further disbursements to me if:
1. I fail to make any monthly payment to you when due; or
2. I die; or
3. I break any of my other promises in this Note; or
4. Any bankruptcy proceeding is begun by or against me, or I assign any of my assets for the benefits of my creditors; or
5. I provide any false written statement in applying for any Loan subject to the terms of this Note or at any time during the term of any such Loan; or
6. I become insolvent; or
7. In your judgment, there is a significant lessening of my ability to repay any Loan subject to the terms of this Note; or
8. I am in default on any Loan subject to the terms of this Note I may already have with you, or on any such Loan I may have with you in the future.

My failure to receive a statement or coupon book does not relieve me of my responsibility and obligation of making the required payments for any Loan in accordance with the terms and conditions of this Note. If I am in default, I will be required to pay interest on any Loan accruing after default. The interest rate (Variable Rate) after default will be subject to adjustment in the same manner as before default.

**K. COLLECTION COSTS**

When and as permitted by applicable law, I agree to pay you reasonable amounts, including reasonable attorney's fees for any attorney who is not your regularly salaried employee and court and other collection costs, that you incur in enforcing the terms of this Note if I am in default.

**L. NOTICES**

1. I will send written notice to you, or any subsequent holder of this Note, within ten (10) days after any change in my name, address, telephone number, or Institution enrollment status.

2. Any notice required to be given to me by you will be effective (i) when mailed by first class mail to the latest address you have for me or (ii) if I agree to receive notices and other communications electronically, when transmitted by electronic communication to the latest electronic mail address you have for me. Unless required by applicable law, you need not give a separate notice to the cosigner, if any.

3. State Law Notices - As required by law, I am hereby notified that a negative credit report reflecting on my credit record may be submitted to a credit reporting agency if I fail to fulfill the terms of my credit obligations. A married applicant may apply for a separate account. I agree that the lender may obtain a consumer report (credit report) about me from a consumer reporting agency (credit bureau). Upon my request, I will be informed whether or not the lender obtained a consumer report about me, and if so, the name and address of the consumer reporting agency that furnished the report. If my Application is approved, subsequent consumer reports may be requested or used in connection with an update, renewal or extension of the credit for which I have applied. **NEW JERSEY RESIDENTS:** Because certain provisions of this Note are subject to applicable law, they may be void, unenforceable or inapplicable in some jurisdictions. None of these provisions, however, is void, unenforceable or inapplicable in New Jersey. **OHIO RESIDENTS:** The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio civil rights commission administers compliance with this law. **MARRIED WISCONSIN RESIDENTS:** (a) My signature confirms that each Loan is being incurred in the interest of my marriage or family; (b) No provision of a marital property agreement, a unilateral statement under Section 766.59 or a court decree under Section 766.70 of the Wisconsin Statutes adversely affects the interest of the creditor unless the creditor, prior to the time credit is granted, is furnished a copy of the agreement, statement or decree or has actual knowledge of the adverse provision when the obligation to the creditor is incurred; (c) Unless the co-borrower or cosigner (if any) is my spouse, the lender is required to ask me to provide the name and address of my spouse. Unless I have provided such information at the time of my Application, I will provide such information by calling the lender at 800-539-5363 or writing to the lender at Key Education Resources, 745 Atlantic Avenue, Boston, MA 02111 within fifteen (15) days after the initial Disbursement Date of any Loan subject to the terms of this Note.

**M. COSIGNER NOTICES**

For purposes of these "Cosigner Notices" only, the words "you," "your," and "yours" mean the person(s) who signed this Note as a cosigner, and the word "bank" means KeyBank National Association, Cleveland, Ohio, or its successors and assigns, and any other holder of this Note.

**NOTICE TO COSIGNER:** You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility. You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount. The bank can collect this debt from you without first trying to collect from the borrower. The bank can use the same collection methods against you that

Page 2 of 7

Appendix Page 2

REDACTED

Date: October 21, 2004

Borrower Name: Matt C. Kilgore

Cosigner Name:

Borrower Social Security Number:

Cosigner Social Security Number:

can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of your credit record. This notice is not the contract that makes you liable for the debt.

ILLINOIS AND MICHIGAN RESIDENTS: Notice to Cosigner: You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility. You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount. The bank can sue the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of your credit record. This notice is not the contract that makes you liable for the debt.

NEW YORK RESIDENTS: NOTICE: You agree to pay the debt identified below although you may not personally receive any property, services, or money. You may be sued for payment although the person who receives the property, services, or money is able to pay. You should know that the Total of Payments listed below does not include finance charges resulting from delinquency, late charges, repossession or foreclosure costs, court costs or attorney's fees, or other charges that may be added in the note or contract. You will also have to pay some or all of these costs and charges if the note or contract, the payment of which you are guaranteeing, requires the borrower to pay such costs and charges. This notice is not the note, contract, or other writing that obligates you to pay the debt. Read that writing for the exact terms of your obligation.

IDENTIFICATION OF DEBT(S) YOU MAY HAVE TO PAY

Name of Debtor: The person(s) identified as the borrower and co-borrower at the time of Application.
Name of Creditor: KeyBank National Association, and its successors or assigns.
Date: The Date of this Note.
Kind of Debt: Education Loan
Total of Payments: The "Loan Amount Requested" identified at the time of Application plus interest as set forth in Paragraph E of this Note.
You acknowledge by your signature on this Note that you have been given a completed copy of this notice and of each writing that obligates you or the Debtor on this debt.

VERMONT RESIDENTS: NOTICE TO COSIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.

N. COSIGNER OBLIGATIONS

If I signed this Note as a cosigner, I hereby unconditionally guarantee payment of the borrower's and/or co-borrower's Loan(s) subject to the terms of this Note when due and in accordance with the terms of this Note. I waive notice of acceptance hereof, and waive all notices to which I might otherwise be entitled by law. I waive all suretyship defenses that might be available to me (including, without limitation, contribution, subrogation, and exoneration). I agree that the borrower may pay any forbearance, extension, or other modification of the repayment schedule and that such agreement will be binding on me. Unless required by applicable law, it shall not be necessary for you to resort to or exhaust your remedies against the borrower and/or co-borrower before calling on me to make repayment. I acknowledge that I have read, understand, and agree to the terms of the Cosigner Notice(s) that appears in Paragraph N and that applies to me and, if I am a California or Iowa resident, to the terms of the separate state-specific cosigner notice incorporated in and made a part of this Note that applies to me.

O. INFORMATION SHARING

Disclosure of Account Information: You may share information within the KeyCorp family of companies as well as with unaffiliated third parties external to Key as described in your Privacy Policy. We specifically consent to you sharing information within the KeyCorp family of companies and with external unaffiliated third parties.

NOTE: I/we may elect to opt out of information sharing, or may be automatically opted-out under our state law, as described in your Privacy Policy. If I/we are opted out, that election will override this consent to share, except for those instances in which you are otherwise permitted to share by law without our consent.

P. DISCLOSURE OF ACCOUNT INFORMATION TO CONSUMER REPORTING AGENCIES; INACCURATE INFORMATION

You are committed to furnishing complete and accurate information about credit accounts, including any Loan subject to the terms of this Note, to consumer reporting agencies. If the information you report about any of my Loans is inaccurate, I will write to: Great Lakes Higher Education Servicing Corporation, P.O. Box 7860, Madison, WI 53707-7860. In my correspondence I should include the following information: my social security number, Loan account number(s), a copy of my credit bureau reporting reflecting the inaccurate information, and my name, address, city, state and zip code.

Q. ARBITRATION

This Arbitration Provision sets forth the circumstances and procedures under which Claims (as defined below) may be arbitrated instead of litigated in court. This Arbitration Provision supersedes and replaces any existing arbitration provision between you and me.

This Arbitration Provision will apply to my Note or Prior Promissory Note (as defined below) unless I notify you in writing that I reject the Arbitration Provision within 60 days of signing my Note. The rejection notice should be sent to Key Education Resources-Arbitration, P.O. Box 55445, Boston, MA 02205-5445. The notice must include the borrower's name, the names of any co-borrower or cosigner and the Loan number(s) and must be signed by the borrower and the co-borrower or cosigner, if any. The rejection notice should not include any other correspondence. Calling the lender to reject the Arbitration Provision or providing notice by any other manner or format than as described above will not operate as a rejection of this Arbitration Provision and consequently this Arbitration Provision will become part of this Note. Rejection of this Arbitration Provision does not serve as rejection of any other term or condition of the Note or Prior Promissory Note (as defined below) with the lender governing the Loan or loan.

For purposes of this Arbitration Provision, the words "you" and "your" shall mean KeyBank National Association, Cleveland, Ohio, third parties that have or may have had a relationship with you or me relating to the Loan Program (including, without limitation, any institution or servicer of any Loan or any loan that I have or may have had in effect under the Loan Program before the date of this Note (and that is consolidated or the total outstanding balance of which is aggregated under Paragraph B)), any other holder of this Note or any prior promissory note relating to any loan that I have or may have had in effect under the Loan Program before the date of this Note and that is consolidated or the total outstanding balance of which is aggregated under Paragraph B ("Prior Promissory Note"), and all of their respective parents, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, employees, officers, and directors

As used in this Arbitration Provision, the word "Claim" means any claim, dispute, or controversy between you and me arising from or relating to this Note, any Prior Promissory Note, or the relationships resulting from this Note or any Prior Promissory Note, including, without limitation, the validity, enforceability, or scope of this Arbitration Provision, this Note, or any Prior Promissory Note. "Claim" includes claims of every kind and nature, whether pre-existing, present, or future, including, without limitation, initial claims, counterclaims, cross-claims, and third-party claims, and claims based upon contract, tort, fraud and other intentional torts, constitution, statute, regulation, common law, and equity (including, without limitation, any claim for injunctive or declaratory relief). The word "Claim" is to be given the broadest possible meaning and includes, by way of example and without limitation, any claim, dispute, or controversy that arises from or relates to (a) any Loan subject to the terms of this Note or any loan that I have or may have had in effect under the Loan Program before the date of this Note and that is consolidated or the total outstanding balance of which is aggregated under Paragraph B, (b) the goods or services purchased with the proceeds of any such Loan or loan, (c) the financing of any such Loan or loan, (d) advertisements, promotions, or oral or written statements related to this Note, any Prior Promissory Note, any such Loan or loan, goods or services purchased with the proceeds of any such Loan or loan, or the terms of any such Loan or loan, (e) any application for any such Loan or loan and (f) the origination or servicing of any such Loan or loan or the origination of this Note or any Prior Promissory Note, and (g) the collection of amounts owed by me to you.

This Arbitration Provision will not apply to Claims previously asserted, or that are later asserted, in lawsuits filed before the effective date of the Arbitration Provision or any prior arbitration provision between you and me, whichever is earlier. However, this Arbitration Provision will apply to all other Claims, even if the facts and circumstances giving rise to the Claims existed before the effective date of this Arbitration Provision.

Any Claim shall be resolved, upon the election of you or me, by binding arbitration pursuant to this Arbitration Provision and the applicable rules of either the J.A.M.S/Endispute or the National Arbitration Forum in effect at the time the Claim is filed (the "Arbitration Rules"). I may select one of these organizations to serve as the arbitration administrator if I initiate an arbitration against you or if either you or I compel arbitration of a Claim that the other party has brought in court. In addition, if you intended to initiate an arbitration against me, you will notify me in writing and give me twenty (20) days to select one of these organizations to serve as the arbitration administrator; if I fail to select an administrator within that twenty (20)-day period, you will select one. In all cases, the arbitrator(s) should be a lawyer with more than ten (10) years of experience or a retired judge. If for any reason the selected organization is unable or unwilling or ceases to serve as the arbitration administrator, I will have twenty (20) days to select a different administrator from the above list; if I fail to select a different administrator within the twenty (20)-day period, you will select one. In all cases, a party who has asserted a Claim in a lawsuit in court may elect arbitration with respect to any Claim(s) subsequently asserted in that lawsuit by any other party or parties.

Page 3 of 7

Appendix Page 3

REDACTED

Date: October 21, 2004

Borrower Name: Matt C. Kilgore

Cosigner Name:

Borrower Social Security Number:

Cosigner Social Security Number:

IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR I WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM, OR TO ENGAGE IN PRE-ARBITRATION DISCOVERY EXCEPT AS PROVIDED FOR IN THE APPLICABLE ARBITRATION RULES. FURTHER, I WILL NOT HAVE THE RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. EXCEPT AS SET FORTH BELOW, THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING. I UNDERSTAND THAT OTHER RIGHTS THAT I WOULD HAVE IF I WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION. THE FEES CHARGED BY THE ARBITRATION ADMINISTRATOR MAY BE GREATER THAN THE FEES CHARGED BY A COURT.

There shall be no authority for any Claims to be arbitrated on a class action basis. Furthermore, an arbitration can only decide your or my Claim(s) and may not consolidate or join the claims of other persons that may have similar claims. There shall be no pre-arbitration discovery except as provided for in the applicable Arbitration Rules. Any arbitration hearing that I attend shall take place in the federal judicial district of my residence. At my written request, you will pay all fees up to $100.00 charged by the arbitration administrator for any Claim(s) asserted by me in the arbitration, after I have paid an amount equivalent to the fee, if any, for filing such Claim(s) in state or federal court (whichever is less) in the judicial district in which I reside. (If I have already paid a filing fee for asserting the Claim(s) in court, I will not be required to pay that amount again.) If I am required to pay any fees in excess of $100.00 to the arbitration administrator ("additional fees"), you will consider a request by me to pay all or part of the additional fees. To the extent that you do not approve my request, the Arbitrator will decide whether you or I will be responsible for paying any such additional fees. If the arbitrator issues an award in your favor, I will not be required to reimburse you for any of the fees you have previously paid to the administrator or for which you are responsible. Each party shall bear the expense of that party's attorneys', experts', and witness fees', regardless of which party prevails in the arbitration, unless applicable law and/or this Note gives a party the right to recover any of those fees from the other party.

This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. Sections 1 et seq. The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statutes of limitations and shall honor claims of privilege recognized at law [and, at the timely request of any party, shall provide a brief written explanation of the basis for the award]. In conducting the arbitration proceeding, the arbitrator shall not apply the federal or any state rules of civil procedure or rules of evidence. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA and except that, if the amount in controversy exceeds $10,000.00, any party can appeal the award to a three-arbitrator panel administered by the arbitration administrator which shall reconsider de novo (i.e., without regard to the original arbitrator's findings) any aspect of the initial award requested by the appealing party. The decision of the panel shall be by majority vote. The costs of such an appeal will be borne by the appealing party regardless of the outcome of the appeal. You and I shall keep confidential any decision of an arbitrator made with respect to any Claim(s) arbitrated under this Arbitration Provision and, with the exception of disclosure to your or my attorneys, accountants, auditors, and other legal or financial advisors, shall not disclose such decision to any other person.

This Arbitration Provision shall survive termination of this Note or any Prior Promissory Note, as well as the repayment of all amounts payable to you under the terms of this Note or any Prior Promissory Note. If any portion of this Arbitration Provision is deemed invalid or unenforceable under any law or statute consistent with the FAA, it shall not invalidate the remaining portions of this Arbitration Provision or the Note. In the event of a conflict or inconsistency between the applicable Arbitration Rules and this Arbitration Provision, this Arbitration Provision shall govern.

**Contacting Arbitration Administrators**

If I have a question about the arbitration administrators mentioned in this Arbitration Provision or would like to obtain a copy of their Arbitration Rules or fee schedules, I can contact them as follows: J.A.M.S/Endispute, 222 South Riverside Plaza, Suite 1850, Chicago, IL 60606, www.jams-endispute.com, (800) 352-5267, Financial Services Arbitration Rules and Procedures; National Arbitration Forum, P.O. Box 50191, Minneapolis, MN 55405, www.arbitration-forum.com, (800) 474-2371, Code of Procedure.

**R. ADDITIONAL AGREEMENTS**

1. Use of Loan Proceeds - I will use the proceeds of any Loan subject to the terms of this Note only for my educational expenses (i) at an eligible Institution or (ii) relating to the Loan Program. The co-borrower (unless I am student for whose educational expenses the Loan is obtained) and/or cosigner, if any, will not receive any of the Loan proceeds. I authorize you, at your option, to disburse the proceeds of my Loan directly to the Institution that I designate or to me in periodic disbursements. The Institution is my agent for the purpose of receiving the proceeds of such Loan.

For purposes of paragraph R.1. "I", "we", and "my" refer only to borrower.

2. Cancellation of Disbursements - If I am not satisfied with the terms of each disbursement as approved, I may cancel such disbursement. To cancel the disbursement, I will return the disbursement check not cashed to you within thirty (30) days after the Disbursement Date. If the disbursement was sent to the Institution or other third party, I will instruct the Institution or authorized party to return the disbursement proceeds to you within this thirty (30)-day period. I will notify you of this cancellation instruction. My timely cancellation of a disbursement will not terminate my obligations under this Note unless the cancelled disbursement is the first and only disbursement made under the terms of this Note.

3. Governing Law; Choice of Forum - I understand that I must repay this Note though I may be under eighteen (18) years of age when this Note is signed.

4. Partial Payments; No Waiver of Rights - My responsibility for paying any Loan subject to the terms of this Note is unaffected by the liability of any other person to me or by your failure to notify me that a required payment has not been made. Without losing any of your rights under this Note, you may accept late or partial payments. I agree not to send payments marked "paid in full," "without recourse," or with other restrictions unless they are marked for special handling and sent to: Great Lakes Higher Education Corporation, Cash Operations, P.O. Box 2992, Milwaukee, WI 53201-2992. You may delay, or fail to exercise, or waive any of your rights on any occasion without losing your entitlement to exercise the right at any future time or on any future occasion. You will not be obligated to make any demand upon me, send me any notice, present this Note to me for payment or make protest of nonpayment to me before suing to collect on this Note if I am in default, and to the extent permitted by applicable law, I hereby waive any right I might otherwise have to require such actions.

5. Governing Law; Choice of Forum - I understand and agree that (i) you are located in Ohio, (ii) that this Note will be entered into in Ohio and (iii) that your decision on whether to lend me money will be made in Ohio. CONSEQUENTLY, THE PROVISIONS OF THIS NOTE WILL BE GOVERNED BY FEDERAL LAWS AND THE LAWS OF THE STATE OF OHIO, WITHOUT REGARD TO CONFLICT OF LAWS RULES. I agree that any suit I bring against you (or against any subsequent holder of this Note) must be brought in a court of competent jurisdiction in the county in which you maintain your (or the county in which the subsequent holder maintains its) principal place of business.

6. Assignment - I may not assign this Note or any of its benefits or obligations. You may assign this Note at any time.

7. Entire Agreement - The terms and conditions set forth in this Note constitute the entire agreement between you and me.

8. Modifications - All or any provision of this Note may be modified only if jointly agreed upon in writing by you and me. Any modification will not affect the validity or enforceability of the remainder (if any) of this Note. If all of my Loans subject to the terms of this Note are consolidated under the terms of a new master student loan promissory note relating to loans obtained under the Loan Program that I have signed, such new note will supersede and replace this Note.

9. Severability - If any provision of this Note is held invalid or unenforceable, that provision shall be considered omitted from this Note without affecting the validity or enforceability of the remainder of this Note.

10. Joint and Individual Liability - If more than one person signs this Note, I agree to be fully responsible for payment of this Note, and you may collect from me without trying to collect from other signers. You can extend or change the terms of payment and release any signer without notifying me or releasing me from my responsibility on this Note.

11. Loan Charges - If the charges on any Loan subject to the terms of this Note exceed the amount permitted to be charged by the law that governs this Note, then such charges will be reduced to such permitted amount and any excess already collected will be applied as partial prepayment of principal.

12. I acknowledge that by signing this Note, I am requesting that you will disburse the funds on my behalf either directly to the Institution or via check made payable to the Institution. I understand and acknowledge that the lender, any subsequent holder or their agents do not in any way endorse, promote or make any representations concerning any Institution, including but not limited to the Institution listed in the Application. It is my (our) responsibility to determine the quality of the Institution.

**S. MY CERTIFICATION**

I declare under penalty of perjury under the laws of the United States of America that the following is true and correct. I certify that the information contained or included in my Application for any Loan subject to the terms of this Note is true, complete, and correct to the best of my knowledge and belief and is made in good faith. I, also, certify that all proceeds of any such Loan will be used solely for educational expenses and/or other expenses relating to the Loan Program. I authorize any Institution that I (or if I am not the student, the student) may attend to release to the lender, subsequent holder, or their agents, any requested information pertinent to any Loan subject to the terms of this Note (e.g., employment, enrollment status, prior loan history, current address). I give you permission to request information from me and to make whatever inquiries you consider necessary and appropriate (including requesting and obtaining a consumer report from consumer reporting agencies) in

Page 4 of 7

REDACTED

Date: October 21, 2004

Borrower Name: Matt C. Kilgore

Borrower Social Security Number: '

Cosigner Name:

Cosigner Social Security Number:

considering granting such Loan or disbursements under such Loan and for the purpose of any updates, renewals, or extensions of such Loan, reviewing or collection of my Loan, or for any other lawful purpose. I also authorize the lender, subsequent holder or their agents to check my credit and employment history and to answer questions about their credit experience with me. I also authorize the lender, subsequent holder, Institution, or their agent(s) to make inquires or to respond to inquiries from my (or, if I am not the student, the student's) parents or prior or subsequent lenders or holders with respect to this Note and related documents. For the purpose of learning my current address and telephone number, I authorize the lender, subsequent holder, or their agents to release information and make inquiries to the individuals I have listed on my Application as references. I authorize my lender, subsequent holder or their agents to advise my Institution of the status of my Application or of any such Loan. I may ask you or a subsequent holder to change the date of disbursement if the Educational Institution requires different payments. I further authorize any lender or any holder of my outstanding educational loans to release any information on any of my outstanding educational loans to any other lender or holder of any of my other educational loans. I understand that I must immediately repay any funds that I receive that cannot reasonably be attributed to

meeting my educational expenses related to attendance at an eligible Institution and/or other expenses relating to the Loan Program. At my lender's option, I understand that my lender may electronically transmit funds to the Institution to be applied to my (or, if I am not the student, the student's) account. I authorize my lender to issue a check made payable to me (or, if I am not the student, the student), or jointly payable to the Institution and me (or, if I am not the student, the student), and send it to the Institution. I certify that I am (and that, if I am not the student, the student is) eligible for participation in the Loan Program and that I understand the provisions of this Note and my responsibilities and my rights under the Loan Program. I also certify that I have not filed for bankruptcy in the past seven years.

KeyBank National Association

By: _Beth D. Rosenberg_

Beth D. Rosenberg, President
127 Public Square, Cleveland, Ohio 44114-1306

---

CAUTION – IT IS IMPORTANT THAT I THOROUGHLY READ THE CONTRACT BEFORE I SIGN IT.
NOTICE TO CONSUMER/CUSTOMER:
(a) I WILL NOT SIGN THIS AGREEMENT/NOTE BEFORE I READ IT (EVEN IF OTHERWISE ADVISED).
(b) I WILL NOT SIGN THIS AGREEMENT/NOTE IF IT CONTAINS ANY BLANK SPACES.
(c) I AM ENTITLED TO AN EXACT COPY OF ANY AGREEMENT I SIGN.
(d) I HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE DUE UNDER THIS AGREEMENT/NOTE WITHOUT PENALTY
(e) I UNDERSTAND THAT THE MASTER STUDENT LOAN PROMISSORY NOTE GOVERNING MY LOAN CONTAINS AN ARBITRATION PROVISION UNDER WHICH CERTAIN DISPUTES (AS DESCRIBED IN THE ARBITRATION PROVISION) BETWEEN ME AND YOU AND/OR CERTAIN OTHER PARTIES WILL BE RESOLVED BY BINDING ARBITRATION, IF ELECTED BY ME OR YOU OR CERTAIN OTHER PARTIES. IF A DISPUTE IS ARBITRATED, THE PARTIES WILL NOT HAVE THE OPPORTUNITY TO HAVE A JUDGE OR JURY RESOLVE IT AND OTHER RIGHTS MAY BE SUBSTANTIALLY LIMITED.
I acknowledge that I have received a copy of this Note, Notices and all Cosigner Notices.

| Borrower's Signature | Date | Nov. 2, 2004 | Social Security Number |
| Cosigner x signature | Date | Nov 2, 2004 | Social Security Number |

Sign and mail Note to: Key Alternative Loan, c/o Great Lakes, P.O. Box 182736, Columbus, OH 43218-2736

**YOU MUST RETURN ALL PAGES OF THIS SIGNED PROMISSORY NOTE**

Page 5 of 1

REDACTED

Date: October 21, 2004
Borrower Name: Matt C. Kilgore                    Borrower Social Security Number:
Cosigner Name:                                    Cosigner Social Security Number:

## CALIFORNIA RESIDENTS COSIGNER NOTICE

NOTICE TO COSIGNER (Traducción en Inglés Se Requiere Por La Ley)

You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The creditor can collect this debt from you without first trying to collect from the borrower. The creditor can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of *your* credit record.

This notice is not the contract that makes you liable for the debt.

AVISO PARA EL FIADOR (Spanish Translation Required By Law)

Se le está pidiendo que garantice esta deuda. Piénselo con cuidado antes de ponerse de acuerdo. Si la persona que ha pedido este préstamo no paga la deuda, usted tendrá que pagarla. Esté seguro de que usted podrá pagar si sea obligado a pagarla y de que usted desea aceptar la responsabilidad.

Si la persona que ha pedido el préstamo no paga la deuda, es posible que usted tenga que pagar la suma total de la deuda, mas los cargos por tardarse en el pago o el costo de cobranza, lo cual aumenta el total de esta suma.

El acreedor (financiero) puede cobrarle a usted sin, primeramente, tratar de cobrarle al deudor. Los mismos metodos de cobranza que pueden usarse contra el deudor, podran usarse contra usted, tales como presentar una demanda en corte, quitar parte de su sueldo, etc. Si alguna vez no se cumpla con la obligación de pagar esta deuda, se puede incluir esa información en la historia de credito de usted.

Este aviso no es el contrato mismo en que se le echa a usted la responsabilidad de la deuda.

11-2-04
(Date)                    (Cosigner Signature)

Appendix Page 6

REDACTED*

DCT-1-2004  15:24  FROM:                                                                 P.4

Applicant's Name: (First & Last) _Matt Kilgore_____

## Personal References: Please list four, all must have COMPLETE Addresses, with City, State and Zip Code.
### (Physical address only, P.O. Box NOT acceptable.)

To Qualify as a Personal Reference the persons listed must have known the applicant for at least one (1) year
and cannot reside at the same address.

| Name: | Address: |
|---|---|
| | Street: |
| Home Phone# | City: _                    State_      _ Zip Code__ |
| Name: | Address: |
| | Street: _ |
| Home Phone# | City: _                    State_      __ Zip Code__ |
| Name: | Address: |
| | Street: _ |
| Home Phone # | City: _                    State_     _ ,Code__ |
| Name: | Address: |
| | Street: __ |
| Home Phone # | City:                    __ Stele__    __ Zip Code_ |

If you have any personal accomplishments, special skills or training that you would like us to know prior
to an interview please list on a separate sheet of paper.

3.

*I redacted the names and contact information of the references.

Appendix Page 7

REDACTED

# Federal Truth in Lending Disclosure
## Key Alternative Loan

MATT C KILGORE

SILVER STATE HELICOPTERS LLC

Creditor: KeyBank National Association
*Please direct all questions or correspondence to:*
Great Lakes Educational Loan Services, Inc.
2401 International Lane
Madison, WI 53704-3192
(800) 236-4300

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 5.16% e | $44,098.80 e | $55,950.00 | $100,048.80 e |

Your payment schedule will be:

| Number of Payments | Amount of Payments | Payments are Due Monthly Commencing |
|---|---|---|
| 240 e | $416.87 e | 05/01/2007 e |

Variable Rate: The Variable Rate on this loan may increase or decrease and is equal to the "Current Index", plus a margin as defined below. The "Current Index" is the three-month London Interbank Offered Rate ("LIBOR") published in the "Money Rates" section of *The Wall Street Journal* on the 20th day of the month preceding the applicable "Change Date" (e.g., December, March, June and September). During the Interim Period, the Variable Rate is equal to the "Current Index" plus 3.30% per annum. During the Repayment Period, the Variable Rate is equal to the "Current Index" plus 3.30% per annum. The Variable Rate will change quarterly on the first day of each January, April, July and October (the "Change Date"). Under no circumstances will the Variable Rate exceed the maximum rate allowable under applicable law. Increases in the Variable Rate may result in an increase in the number of payments while decreases in the Variable Rate may result in a decrease in the number of payments. In cases where the monthly payment will not repay the loan in full within the maximum permissible Repayment Period, an increase in the interest rate may result in higher payments. For example, if your repayment amount is $62,700 for 240 months with a monthly payment of $564.13 and an initial interest rate of 9.00% and on the first Change Date the interest rate increases to 9.50% immediately after your first monthly payment, your repayment period would increase by 34 months. The repayment term is the aggregate of the outstanding principal balance of all your loans in the program as outlined in your Promissory Note. The most current Federal Truth in Lending Disclosure will provide the repayment term.

Late Charge: If a payment is more than 15 days late, you may be charged the lesser of $5 or 5% of the unpaid amount of the payment.

Prepayment: If you pay off your loan early, you will not be entitled to a refund of any part of the Loan Fee. If you pay off your loan early, you will not have to pay a penalty.

See your appropriate contract documents for any additional information about nonpayment, default, prepayment penalties and any required repayment in full before the scheduled date. All numerical disclosures except the late payment disclosure are estimates based on your 10/01/2006 anticipated graduation date.

(e) means an estimate

| Itemization of the Amount Financed of: | |
|---|---|
| Loan Amount given to you directly: | $55,950.00 |
| Amount paid to others on your behalf: | N/A |
| Total Loan Fee: | $55,950.00 |
| | $0.00 |

### Schedule of Advances of Amount Financed

| Scheduled Date of Advances e | Amount of Advances | Loan Fee |
|---|---|---|
| 11/15/2004 | $16,000.00 | $0.00 |
| 01/05/2005 | $13,369.00 | $0.00 |
| 04/05/2005 | $13,369.00 | $0.00 |
| 07/05/2005 | $13,212.00 | $0.00 |

2145T (09/01)
FUL.97A

REDACTED

# Federal Truth in Lending Disclosure - Revised Disclosure
# Key Alternative Loan

07/01/2005
MATT C KILGORE

Creditor: KeyBank National Association
*Please direct all questions or correspondence to:*
Great Lakes Educational Loan Services, Inc.
2401 International Lane
Madison, WI 53704-3192

SILVER STATE HELICOPTERS LLC          (800) 236-4300

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| $6.62\%^e$ | $\$60,157.20^e$ | $\$55,950.00$ | $\$116,107.20^e$ |

Your payment schedule will be:

| Number of Payments | Amount of Payments | Payments are Due Monthly Commencing |
|---|---|---|
| $240^e$ | $\$483.78^e$ | $05/01/2007^e$ |

Variable Rate: The Variable Rate on this loan may increase or decrease and is equal to the "Current Index", plus a margin as defined below. The "Current Index" is the three-month London Interbank Offered Rate ("LIBOR") published in the "Money Rates" section of *The Wall Street Journal* on the 20th day of the month preceding the applicable "Change Date" (e.g., December, March, June and September). During the Interim Period, the Variable Rate is equal to the "Current Index" plus 3.30% per annum. During the Repayment Period, the Variable Rate is equal to the "Current Index" plus 3.30% per annum. The Variable Rate will change quarterly on the first day of each January, April, July and October (the "Change Date"). Under no circumstances will the Variable Rate exceed the maximum rate allowable under applicable law. Increases in the Variable Rate may result in an increase in the number of payments while decreases in the Variable Rate may result in a decrease in the number of payments. In cases where the monthly payment will not repay the loan in full within the maximum permissible Repayment Period, an increase in the interest rate may result in higher payments. For example, if your repayment amount is $62,700 for 240 months with a monthly payment of $564.13 and an initial interest rate of 9.00% and on the first Change Date the interest rate increases to 9.50% immediately after your first monthly payment, your repayment period would increase by 34 months. The repayment term is the aggregate of the outstanding principal balance of all your loans in the program as outlined in your Promissory Note. The most current Federal Truth in Lending Disclosure will provide the repayment term.

Late Charge: If a payment is more than 15 days late, you may be charged the lesser of $5 or 5% of the unpaid amount of the payment.

Prepayment: If you pay off your loan early, you will not be entitled to a refund of any part of the Loan Fee. If you pay off your loan early, you will not have to pay a penalty.

See your appropriate contract documents for any additional information about nonpayment, default, prepayment penalties and any required repayment in full before the scheduled date. All numerical disclosures except the late payment disclosure are estimates based on your 10/01/2006 anticipated graduation date.

(e) means an estimate

| Itemization of the Amount Financed of: | $55,950.00 |
|---|---|
| Loan Amount given to you directly: | $13,212.00 |
| Amount paid to others on your behalf: | $42,738.00 |
| Total Loan Fee: | $0.00 |

Schedule of Advances of Amount Financed

| Scheduled Date of Advances$^e$ | Amount of Advances | Loan Fee |
|---|---|---|
| 11/15/2004 | $16,000.00 | $0.00 |
| 01/05/2005 | $13,369.00 | $0.00 |
| 04/05/2005 | $13,369.00 | $0.00 |
| 07/05/2005 | $13,212.00 | $0.00 |

3570 (05/05)